# Illinois Official Reports

## Appellate Court

---

*Condon & Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923

---

| | |
|---|---|
| Appellate Court Caption | CONDON AND COOK, L.L.C., Plaintiff-Appellee, v. THEODORE MAVRAKIS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-1923 |
| Filed<br>Rehearing denied | December 9, 2016<br>January 5, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-011662; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Arnold H. Landis, of Law Office of Arnold H. Landis, P.C., of Chicago, for appellant.<br><br>Paul S. Festenstein, of Condon & Cook, L.L.C., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    In the case at bar, plaintiff law firm, Condon and Cook, L.L.C., filed a complaint against defendant Theodore Mavrakis, a former client, seeking attorney fees and costs in connection with the defense of an arbitration matter filed against defendant, captioned VPC Pizza Franchise, L.L.C. v. Mavrakis. After the trial court entered a default judgment against defendant in the case at bar, defendant sought to negotiate a settlement because the default judgment was preventing him from closing on an unrelated financing deal with a bank. Defendant was represented by counsel who negotiated an oral settlement agreement in 45 minutes on April 24, 2015, the same day that defendant's refinancing deal was originally scheduled to close. The oral settlement agreement was to be memorialized in writing. The refinancing deal closed on April 30 and, after it was closed, defendant refused to sign the written settlement agreement sent by plaintiff, claiming that he had not agreed to the execution of mutual releases between the parties. Plaintiff then filed a motion before the trial court to enforce the settlement agreement and, after an evidentiary hearing, the trial court ordered its enforcement. It is this enforcement order which defendant now appeals.

¶ 2    On appeal, defendant does not dispute that his attorneys had his express authority to negotiate a settlement agreement, or that the agreement was done in haste because he required an immediate settlement or he would have lost his financial transaction with a bank. On appeal, he claims that his attorneys lacked his express authority to agree to mutual releases. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    In the facts below, we provide, first, a summary of the documents in the common law record and then a description of the bystander's report filed after the commencement of this appeal. The report describes the evidentiary hearing before the trial court on May 14, 2015, that led to the trial court's order on the same date, ordering enforcement of the settlement. In our description of the facts, we name specific attorneys because who said what to whom and when is at the heart of this dispute.

¶ 5                                I. Common Law Record

¶ 6    On November 10, 2014, plaintiff filed a lawsuit against defendant for legal services and costs from defending an arbitration against defendant, known as VPC Pizza Franchise, L.L.C. v. Mavrakis. Plaintiff alleged in the lawsuit that it was retained based on an agreed hourly rate, that it rendered legal services which were billed, and that defendant failed to pay for legal services and costs.

¶ 7    On December 10, 2014, an attorney filed an appearance on defendant's behalf but never filed an answer. On February 17, 2015, plaintiff filed a motion for a default which was granted on February 24, 2015, setting a prove-up for March 18, 2015. Plaintiff served counsel for defendant by certified mail on February 24, 2015, with the order, and filed a motion on March 13, 2015, for a prove-up. In the motion, plaintiff alleged that defendant had an oral agreement with plaintiff to pay attorney fees on an hourly basis, that defendant stopped paying the monthly invoices on July 31, 2014, that defendant "forced Plaintiff to seek withdrawal from his defense," and that defendant "terminated the Plaintiff's legal services on October 16,

2014." Plaintiff sought an award of attorney fees in the amount of $110,538.05, and unspecified costs incurred in the defense of this litigation.

¶ 8    On March 18, 2015, the trial court entered an order, which found that defendant had failed to appear in court and that "[j]udgment in the sum of $110,538.05 in attorney's fees and court costs in the sum of $397.00 is entered in favor of the Plaintiff, Condon & Cook LLC and against the Defendant Theodore Mavrakis."

¶ 9    On April 16, 2015, defense counsel Carol Mengel filed a motion pursuant to section 2-1301(e) of the Code of Civil Procedure (735 ILCS 5/2-1301 (West 2014)) to vacate the default judgment, claiming defendant "had not yet been able [on March 18, 2015,] to retain counsel for this matter" and that defendant was "prepared to file its Answer to the Complaint upon entry of an order vacating default judgment." On April 23, 2015, attorney George C. Pontikes entered an "Additional Appearance on behalf of" defendant.

¶ 10    On April 23, 2015, the trial court entered an order continuing the motion to May 8, 2015. The next day, on April 24, defendant's additional counsel, George Pontikes, filed an emergency motion to have the matter heard on April 24, 2015, because defendant:

"had a financing transaction, which was to take place on April 24, 2015, which would be abrogated by the recorded Memorandum of Judgment."

¶ 11    On April 24, 2015, the parties' attorneys met at the courthouse for settlement negotiations, as detailed in a bystander's report, which is described in section II of this opinion.

¶ 12    Following settlement negotiations, the trial court entered an order on April 24, 2015, which stated, in relevant part:

"[I]t is hereby stipulated and agreed as follows:

(1) The March 18, 2015 Judgment against the Defendant is hereby vacated, with right to reinstate.

(2) The Memorandum of Judgment filed by Plaintiff is vacated and released."

¶ 13    On May 8, 2015, plaintiff filed an emergency motion to enforce the settlement agreement. Although the parties agree in their briefs to this court that plaintiff filed this motion, it is not in our appellate record. Thus, the record lacks the motion, the granting of which is the basis of this appeal. If defendant filed a response to the motion, it is also not in the record.

¶ 14    On May 8, 2015, the trial court entered an order allowing Arnold Landis to substitute for counsel for defendant, and on May 14, George Pontikes withdrew his appearance of record and Landis entered his appearance.

¶ 15    On May 14, 2015, the trial court held an evidentiary hearing on plaintiff's motion to enforce the settlement agreement. After the evidentiary hearing, the trial court granted plaintiff's motion, finding that the terms of the oral settlement agreement included the mutual releases. The court found "that the Settlement is binding upon Plaintiff and Defendant and the agreement is set forth in Vincent Cook Affidavit Exhibit #11 to the Motion."

¶ 16    Attached to the order is exhibit No. 11, which is entitled "Settlement Agreement and Mutual Release." The agreement is five pages long, and it states that it was "[e]xecuted this 30th day of April, 2015, by the undersigned." The agreement is signed by Vincent Cook, as a partner of plaintiff. However, the signature line for defendant is not signed.[1] Paragraph 10(a)

_____

[1]As explained below in the bystander's report, Cook prepared this document and emailed it to Bazianos, defendant's attorney. However, it was not signed or returned by defendant.

of the agreement states that "[u]pon [defendant's] receipt of [plaintiff's] signed Settlement Agreement and Mutual Release, [defendant] does hereby release" plaintiff from any claims that defendant "has, may have had, or which may hereafter arise against [plaintiff] related in any way to the Litigation," which was the subject of plaintiff's suit for attorney fees.

¶ 17    Paragraph 10(b) provides for a release by plaintiff but provides that, until defendant has paid in full, plaintiff "has the right to reinstate the collection action," as well as the judgment contained in the March 18, 2015, order.

¶ 18    On June 4, 2015, the trial court entered a "Memorandum of Judgment," stating that judgment had been entered by the court in favor of plaintiff and against defendant on May 14, 2015, in the amount of $115,935.05, with costs of $397.

¶ 19    On June 15, 2015, defendant filed a motion to reconsider the trial court's May 14, 2015, order. In his motion, defendant claimed that, on April 24, 2015, when the trial court granted defendant's motion to vacate the default judgment, "the parties discussed, but did not agree to, the basic terms of the settlement," and that his attorney "prepared a draft settlement agreement that contained the basic terms of the settlement (see attached)." Although defendant's motion states that the draft prepared by his attorney is "attached," it is not attached in the copy appearing in the appellate record.

¶ 20    The motion further claims that, on April 30, 2015, "for the first time, Plaintiff demanded that the settlement agreement contain a mutual release," which defendant "never agreed to." Attached to the motion are two affidavits: one from defendant, and one from his attorney, George Pontikes. Both affidavits were struck by the trial court.[2]

¶ 21    In an order dated June 23, 2015, the trial court denied defendant's motion to reconsider and held that "[t]he affidavits of [defendant] and [his counsel] George Pontikes attached to Defendant's Motion are hereby stricken." On July 6, 2015, defendant filed a notice of appeal, appealing both (1) the May 14, 2015, order, which granted plaintiff's motion to enforce settlement and (2) the June 23, 2015, order, which denied defendant's motion to reconsider. On July 13, 2015, defendant filed an amended notice of appeal because the prior notice had mistakenly referred to him as "plaintiff."

¶ 22    On June 30, 2016, defendant filed a supplemental record in this court which included a bystander's report certified by the clerk of the circuit court of Cook County. Ill. S. Ct. R. 323(c) (eff. Dec. 13, 2005).

¶ 23                    II. The Bystander's Report

¶ 24    The bystander's report describes the evidentiary hearing on May 14, 2015, in which three witnesses testified: (1) Vincent P. Cook, plaintiff's attorney; (2) William Bazianos, one of defendant's attorneys; and (3) George Pontikes, who was also an attorney for defendant.

---

[2]In his opening appellate brief, defendant did not challenge the trial court's ruling striking these two affidavits, so that issue is not before us. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued" by the appellant in its opening brief "are waived and shall not be raised in the reply brief, in oral argument, or on [a] petition for rehearing.").

## A. Vincent P. Cook

Cook testitifed that his firm had represented defendant in a prior arbitration matter concerning defendant's alleged breach of two franchise agreements relating to his ownership of two Giordano's restaurants. His firm withdrew as counsel for defendant prior to the arbitration hearing because the firm was not paid and defendant refused to authorize the hiring of a forensic accountant and investigators and the ordering of transcripts and evidence deposition videos, which were needed to adequately represent defendant at the hearing. Defendant owed the firm over $100,000 in attorney fees and costs at the time of the firm's withdrawal.

Cook testified that, after his firm secured a default judgment against defendant and defendant had moved to vacate it, George Pontikes informed Cook during a telephone conference that Pontikes wanted to continue the hearing on defendant's motion to vacate from April 23 to May 8, 2015, to permit settlement discussion. Cook was then surprised when Pontikes, on April 24, 2015, filed an emergency motion to advance the May 8 hearing date. Pontikes told him that he was not aware that defendant had a financing transaction that would be abrogated by the recorded memorandum of judgment.

Cook testified that, at 9 a.m. on April 24, 2015, as he and Paul Festenstein, another attorney in Cook's firm, approached the courtroom, they were met by defense attorneys, Pontikes and Bazianos. Bazianos informed Cook that he was in telephone contact with defendant and that defendant had to settle the case in order to close on a new $5.1 million refinancing transaction with Wintrust Bank. Bazianos told Cook that the refinancing loan would not close unless the default judgment was vacated. Bazianos told him: "If you don't agree to vacate this, the refinancing will not go through, and none of the attorneys will get paid."

Cook testified that, on April 24, 2015, the four attorneys then met in the trial judge's jury room for 45 minutes where they engaged in settlement negotiations. Defendant agreed to make two payments to plaintiff totaling $110,538.05. During these negotiations, Bazianos sent an email to defendant outlining the financial terms of the settlement, and then Cook and Festenstein were shown a reply email from defendant to Bazianos accepting those terms. Then Pontikes asked Cook and Festenstein: "Anything else?" Cook then told both Bazianos and Pontikes that plaintiff would approve a settlement only if it included mutual releases signed by both parties, because Cook "had had it" with defendant and "wanted nothing further to do with him." No one raised the issue of a one-way release.

Cook testified that Bazianos then left the jury room, returned five minutes later, and told all three attorneys present: "We have a deal." Cook then reiterated the requirement of mutual releases, and Bazianos repeated "[w]e have a deal." If Bazianos had told him that defendant would not provide a mutual release and intended to file a counterclaim, then plaintiff would not have settled. Cook testified that he never entered into a settlement agreement without mutual releases.

Cook testified that Festenstein then left to attend to another unrelated matter and the three remaining attorneys approached the trial judge to inform her that they had reached a settlement. The settlement included plaintiff's agreement to vacate the default judgment and to rescind the memorandum judgment, which permitted defendant to obtain his $5.1 million refinancing loan from Wintrust Bank and thereby avoid—what Bazianos had described to Cook as—imminent bankruptcy. The trial judge then entered the agreed order vacating the

default judgment. However, the judge did not dismiss the case, since the agreement had to be reduced to writing and signed by both parties.

¶ 32    As part of the oral settlement agreement, Cook testified that Bazianos told him on April 24, 2015, that he would personally prepare and forward that same afternoon two required mortgages and notes on real estate owned by defendant, which were to be used to secure the two payments comprising the settlement. Bazianos told Cook that he would prepare two mortgages on two separate properties located in Evanston and Tinley Park, Illinois, in favor of plaintiff to be signed by defendant and deliver them no later than close of business on April 24, 2015. Despite repeated requests by Cook to Bazianos, these mortgages and notes were never prepared and delivered.

¶ 33    Cook testified that, on April 24, 2015, Pontikes, defendant's other attorney, told him that he would prepare the settlement agreement and submit it to Cook for review by the close of business that same day. However, no agreement was delivered that day. On April 28, 2015, Cook received a letter via email from Pontikes with a proposed settlement agreement attached that did not include the mutual releases. On April 29, at 1:59 p.m., Cook sent a reply email to Pontikes stating that the mutual release language needed to be included. At 6:40 p.m., Cook received a second letter via email from Pontikes, stating that defendant had terminated him as counsel. Cook immediately phoned Pontikes, and during this phone call, Pontikes admitted that the parties' agreement to provide mutual releases was part of the original settlement agreement that defendant and Bazianos had agreed to on April 24, 2015.

¶ 34    Cook testified that, after the phone call with Pontikes, Cook made repeated calls to Bazianos' cell phone and sent text messages to Bazianos throughout the evening of April 29, asking Bazianos to call him back. Bazianos did not respond. On April 30, 2015, at 1:45 p.m., Cook sent via email his own draft of the proposed settlement agreement to Bazianos, demanding that it be signed and returned. Cook wrote in his email: "we all agreed on the mutual release language last Friday. If there is an evidentiary hearing, we will have to call you and George as witnesses." At 6 p.m., Bazianos called Cook and told him that defendant would not sign the agreement, and that defendant would provide a release only if plaintiff waived the second $55,000 payment.

¶ 35    Cook testified that defendant entered into the settlement agreement on April 24, 2015, in order to induce plaintiff to vacate the default judgment. Defendant knew from his past dealings with Wintrust Bank that, in order to obtain the $5.1 million loan from it, defendant had to settle the present case with plaintiff. Cook testified that it became clear to him that, after defendant closed on his refinancing sometime on April 30, 2015, defendant then reneged on his April 24 settlement with plaintiff.

¶ 36                                    B. William Bazianos

¶ 37    Bazianos testified that defendant was "one of his biggest clients." On the morning of April 24, 2015, he and attorney Pontikes approached attorneys Cook and Festenstein outside of the trial judge's courtroom and asked them to engage in settlement negotiations. Bazianos told opposing counsel that defendant was on the verge of bankruptcy, which could be avoided if he obtained a $5.1 million refinancing loan from Wintrust Bank. Defendant had a tentative closing scheduled for that afternoon and, if the default judgment and memorandum of judgment were not vacated, the refinancing would not occur. The parties negotiated a settlement in 45 minutes, and Bazianos was in telephone contact with defendant the entire

time. However, Bazianos denied receiving authority from defendant to agree to mutual releases and denied informing Cook that he had the authority to include mutual releases in the agreement.

¶ 38 Bazianos testified that he could not recall why he never prepared the agreed-upon mortgage documents or promissory notes or why he was not in contact with attorney Pontikes over the weekend of April 25, 2015. Bazianos admitted that he had received various text and voicemail messages from Cook on April 27 through 29, 2015, but could not recall why he did not respond to these messages. Bazianos admitted that Cook sent him an email on April 30, stating: "we all agreed on the mutual release language last Friday. If there is an evidentiary hearing we will have to call you and George as witnesses." However, he did not answer this email.

¶ 39 Bazianos testified that, at some point after the April 24, 2015, meeting, defendant obtained his $5.1 million loan, but Bazianos could not, at first, recall the date of the closing. After questioning by the judge, Bazianos testified that the closing had occurred on April 30, 2015. On April 30, 2015, at 6 p.m., Bazianos testified that he called Cook to advise him that defendant "will not sign the agreement. He will only give you a release if you waive the second $55,000.00 payment."

¶ 40                                C. George Pontikes

¶ 41 Pontikes testified that he and Bazianos asked to meet with Cook and Festenstein before the April 24, 2015, hearing on the motion to vacate in order to settle the lawsuit. On April 24, defendant had told Pontikes repeatedly to settle the suit. Defendant needed the default judgment vacated and the memorandum of judgment rescinded because it prevented him from obtaining a $5.1 million refinancing loan and, without the loan, defendant faced imminent bankruptcy.

¶ 42 Pontikes testified that, during the settlement negotiations in the trial judge's jury room, attorney Bazianos was in telephone contact with defendant. Once the financial terms of the settlement were agreed to, Bazianos forwarded them to defendant for defendant's approval. Bazianos showed an email from defendant to attorneys Cook and Festenstein, which indicated that he accepted the financial terms of the settlement agreement. Pontikes testified that Cook was adamant during the settlement negotiations on April 24 that, without mutual release, there would be no settlement. Pontikes testified that Cook and Festenstein were insistent on mutual releases because they did not trust defendant. Bazianos left the jury room to call defendant about plaintiff's demand for mutual releases and, when he returned to the jury room, Bazianos assured Cook and Festenstein that he had spoken with defendant and that they had a deal. Pontikes testified that the three remaining attorneys approached the trial judge and advised her of the settlement.

¶ 43 Pontikes testified: "If my silence was acquiescent, then we had an agreement. But on our way back to the office, [Bazianos] said mutual releases were not part of the deal. He did say we had a deal and that clearly one of the conditions of the settlement were [*sic*] the mutual release." Pontikes told attorneys Cook and Festenstein that he would prepare a release[3] and

_____
[3]Cook testified that, on April 24, 2015, Pontikes stated to Cook that Pontikes would prepare the settlement agreement and submit it to Cook by the close of business that same day. However, Pontikes testified that he told Cook that he would prepare "a release," rather than a settlement agreement.

forward it to their office by close of business on April 24, and that Bazianos had agreed to prepare mortgage documents and promissory notes, which would also be forwarded to plaintiff by April 24, 2015. Pontikes sent a draft release to his cocounsel, Bazianos, and defendant on April 24 but did not receive a response from either one, either that Friday or over the following weekend. On April 29, defendant terminated his employment.

¶ 44 Pontikes testified that, later that evening, Cook called and reiterated that the agreed-upon settlement included mutual releases, and Pontikes made no statement to contradict him.

¶ 45 ### D. Defendant's Bystander's Report

¶ 46 The bystander's report, which was certified by the trial court, stated that defendant alleged in his proposed bystander's report, which was not certified by the trial court, that his counsel wanted to call him as a witness but that the trial court indicated that it had insufficient time.

¶ 47 The certified report stated that, when defense counsel attempted to call defendant as a witness, plaintiff, through its attorney Fenstenstein, objected. The trial court sustained the objection, which was premised on the ground that defendant was not present during the settlement negotiations. The trial court barred defendant from testifying, not because of a lack of time, but due to his lack of personal knowledge of what transpired in the jury room on April 24, 2015.

¶ 48 Defendant's bystander's report included an alleged synopsis of the testimony of plaintiff's counsel, Paul Festenstein. However, the certified report stated that Festenstein was not called as a witness by either party and did not testify at the evidentiary hearing on May 14, 2015.

¶ 49 ### E. The Trial Court's Findings

¶ 50 The certified bystander's report contains a section entitled "Judge McGrath's Holding," and it states in full:

> "The witnesses all appeared to be honest and forthright but we have two different scenarios as to what occurred. Two things are clear: First, Defendant needed to get this matter resolved immediately to get the closing done. Second, Plaintiff's [*sic*] would never have entered into the settlement and agreed to vacate the default judgment and memorandum of judgment, had they been advised that Defendant would not release them and would in fact sue them for the very underlying transaction for which they are seeking fees. I am persuaded by the evidence that at the time Mr. Bazianos said 'we have a deal' everyone in the room knew that mutual releases were required as consideration and it was part and parcel of the settlement agreement."

¶ 51 After this bystander's report was certified by the trial court, the parties filed their briefs with this court.

¶ 52 ### ANALYSIS

¶ 53 On appeal, defendant does not dispute that he gave his attorneys express authority to negotiate a settlement agreement but argues that he did not expressly authorize them to agree that he would execute a release. For the reasons discussed below, we affirm the trial court's order enforcing the settlement agreement.

¶ 54                                    I. Standard of Review

¶ 55    Defendant asks us to apply a *de novo* standard of review, stating that he could not locate any case law concerning the proper standard of review for a trial court's ruling on a motion to enforce a settlement agreement. *De novo* consideration means that we perform the same analysis a trial court would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). In contrast, plaintiff argues that, since an evidentiary hearing was held, we should reverse the trial court only if its decision was against the manifest weight of the evidence. For the following reasons, we employ a manifest-weight-of-evidence standard of review.

¶ 56    It is well settled that "[a] settlement agreement is in the nature of a contract and is governed by principles of contract law." *K4 Enterprises, Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 313 (2009) (citing *Solar v. Weinberg*, 274 Ill. App. 3d 726, 731 (1995)); see also *Leavell v. Department of Natural Resources*, 397 Ill. App. 3d 937, 948 (2010); *Kim v. Alvey, Inc.*, 322 Ill. App. 3d 657, 669 (2001). "Illinois encourages the settlement of claims and, to that end, settlement agreements may be oral." *Kim*, 322 Ill. App. 3d at 669. "Oral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *K4 Enterprises*, 394 Ill. App. 3d at 313 (citing *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146 (1997)); *Leavell*, 397 Ill. App. 3d at 948. "Whether the parties intended any condition as a term is a question of fact." *Kim*, 322 Ill. App. 3d at 670. See also *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d 317, 322 (2001) (whether an oral contract exists, what its terms are and what was the intent of the parties are questions of fact).

¶ 57    This court has repeatedly held that "[w]hen presented with a challenge to a trial court's determination that parties reached an oral settlement agreement, a reviewing court will not overturn that finding unless it is against the manifest weight of the evidence." *K4 Enterprises*, 394 Ill. App. 3d at 312; *Kulchawik v. Durabla Manufacturing Co.*, 371 Ill. App. 3d 964, 972 (2007) ("The trial court has discretion to determine whether a settlement occurred, and we will not reverse its decision unless it is contrary to the manifest weight of the evidence."); *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d 317, 322 (2001) (whether an oral settlement agreement exists and its terms are questions of fact and "[w]e will not reverse the judgment of the trial court unless it is contrary to the manifest weight of the evidence").

¶ 58    In the case at bar, since the trial court held an evidentiary hearing, there is no question that a manifest weight standard applies. "A finding regarding the validity of a settlement agreement is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or where a decision is palpably erroneous and wholly unwarranted." *K4 Enterprises*, 394 Ill. App. 3d at 312-13; *Kulchawik v. Durabla Manufacturing Co.*, 371 Ill. App. 3d 964, 969 (2007) ("The court's determination regarding the validity of the settlement agreement is against the manifest weight of the evidence where 'an opposite conclusion is clearly apparent or the fact finder's finding is palpably erroneous and wholly unwarranted.' " (quoting *Joel R. v. Board of Education of Mannheim School District 83*, 292 Ill. App. 3d 607, 613 (1997))).

¶ 59                                    II. Express Authority

¶ 60    Defendant does not deny that his attorneys had his authority to negotiate a settlement agreement with plaintiff and that the agreement was oral and done quickly because he needed the case to be settled immediately or he would lose a lucrative refinancing deal scheduled for that same day.

¶ 61    Now, after having received the benefit from the quickly done, oral agreement, defendant argues that his attorneys lacked his express authority that he would release plaintiff.

¶ 62    "An attorney who represents a client in litigation has no authority to settle a claim of the client absent the client's express authorization to do so." *Kulchawik*, 371 Ill. App. 3d at 969 (citing *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 399 (2002)). " 'Where a settlement is made out of court and is not made part of the judgment, the client will not be bound by the agreement without proof of express authority.' " *Kulchawik*, 371 Ill. App. 3d at 969 (quoting *Shapo*, 336 Ill. App. 3d at 399). "The party alleging authority has the burden of proving that fact." *Kulchawik*, 371 Ill. App. 3d at 969 (citing *Shapo*, 336 Ill. App. 3d at 399).

¶ 63    However, "[w]here a party stands by silently and lets his attorney act in his behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority to a third person." *Kulchawik*, 371 Ill. App. 3d at 971. In the case at bar, Bazianos, defendant's attorney, testified that the negotiations lasted only 45 minutes and that he was in telephone contact with defendant the entire time. Similarly, Cook, plaintiff's attorney, testified that Bazianos assured Cook at the onset of the negotiations that Bazianos was in telephone contact with defendant. In effect, defendant electronically projected himself into the room. He was certainly aware of the negotiations that were taking place at his urgent request and for his benefit, and he stood silently by and let them happen. Thus, defendant cannot now challenge the apparent authority which he bestowed on his attorneys to negotiate a quick, oral settlement.

¶ 64    In addition, " '[w]hile an attorney's authority to settle must be expressly conferred, the existence of the attorney of record's authority to settle in open court is presumed unless rebutted by affirmative evidence that [the] authority is lacking.' " *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d 317, 322 (2001) (quoting *Szymkowski v. Szymkowski*, 104 Ill. App. 3d 630, 633 (1982)). At the time of the negotiations, Pontikes was an attorney of record for defendant, having filed an "Additional Appearance" on behalf of defendant on April 23, 2015. Although the negotiations were not in open court, the attorneys informed the court immediately thereafter that a settlement had been reached. Relying on their representation, the trial court entered an agreed order to vacate the prior default judgment and memorandum of judgment. A couple of weeks later, the trial court conducted an evidentiary hearing and concluded that the apparent authority of defendant's attorney of record during the settlement process was not rebutted. On the record before us, we cannot find that this conclusion is not supported by the evidence.

¶ 65    Further, "[w]hen an act is performed for the benefit of another by a person without authority, or by an authorized agent in excess of his authority, the person for whose benefit the act was done may ratify the act." *Kulchawik*, 371 Ill. App. 3d at 970 (citing *Effingham State Bank v. Blades*, 139 Ill. App. 3d 259, 262 (1985)). " '[R]atification of an unauthorized act is tantamount to an original authorization, and confirms what was originally unauthorized.' " *Kulchawik*, 371 Ill. App. 3d at 970 (quoting *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 14 (2004), and citing *Jones v. Beker*, 260 Ill. App. 3d 481, 485 (1994)). "A client ratifies the actions of his attorney by not repudiating the acts once he has knowledge of them or by accepting the benefits of those acts." *Kulchawik*, 371 Ill. App. 3d at 970 (citing *City of Burbank v. Illinois State Labor Relations Board*, 185 Ill. App. 3d 997, 1033 (1989)). " '[R]atification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an [allegedly] unauthorized transaction.' "

*Kulchawik*, 371 Ill. App. 3d at 970 (quoting *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 310 (1992)).

¶ 66   Although defendant's acquiescence to the agreement here lasted only six days, and thus was arguably not long-term, it was as long as it needed to be to accomplish his ends, namely, the completion of refinancing with Wintrust Bank. The settlement agreement was negotiated on April 24, and the refinancing occurred on April 30. At 6 p.m. on April 30, plaintiff was informed that defendant would not sign a settlement agreement that included mutual releases. Defendant took the benefit that the settlement agreement gave him—namely, the ability to refinance—and then, once his financing was secure, claimed that he had not given his attorney the authorization for him to sign a release.

¶ 67   For all these reasons, we conclude that the trial court's decision to enforce the settlement agreement was not against the manifest weight of the evidence.

¶ 68   We also do not find persuasive defendant's additional claims. In addition to arguing that his attorneys lacked express authority to agree to a release, defendant also argues that the trial court erred in finding that there was a valid settlement agreement because there was allegedly not a meeting of the minds on the mutual-releases term. However, this argument fails for the same reasons, namely, his attorney's apparent authority and Bazianos' assent that "[w]e have a deal" when Cook insisted on mutual releases. Pontikes, defendant's then attorney of record, testified as follows according to the bystander's report:

> "Mr. Pontikes testified that Mr. Cook was adamant during the settlement discussion on April 24, 2015[,] that without mutual releases, there could be no settlement. He testified that Mr. Cook and Mr. Festenstein were very insistent on mutual releases and they said they did not trust [defendant]. Mr. Pontikes testified that Mr. Bazianos left the jury room in order to telephone Mr. Mavrakis by phone *about the demand for mutual releases*, and upon returning to the jury room, Mr. Bazianos advised Mr. Cook and Mr. Festenstein that he had spoken to Mr. Mavrakis and assured Mr. Cook '*okay, we have a deal.*' " (Emphases added.)

We cannot find that the trial court's conclusion that there was, in fact, an agreement was against the manifest weight of the evidence when defendant's own attorney testified that Bazianos left to talk to defendant specifically about the mutual releases, and then returned and said " '[w]e have a deal.' "

¶ 69   Defendant also argues that the trial court erred in barring defendant from testifying at the hearing on the motion to reconsider. However, we cannot find that the trial court abused its discretion when his testimony would not have added any insight to the issue of apparent authority or to the issue of what everyone in the room understood when Bazianos said " '[w]e have a deal.' " Defendant was not physically present during the settlement negotiations.

¶ 70   Defendant relies heavily on our supreme court's decision in *Brewer v. National R.R. Passenger Corp.*, 165 Ill. 2d 100 (1995), in which the supreme court reversed the trial court's order enforcing a settlement agreement. However, in that case, the court observed that "the trial judge did not make any findings of fact or rely on any evidence." *Brewer*, 165 Ill. 2d at 104. By contrast, in the case at bar, the trial court held an evidentiary hearing and, thus, our standard is not *de novo* as it would have been in *Brewer*, but rather against the manifest weight of the evidence.

¶ 71 In addition, in *Brewer*, the agreement was set forth in a court order, but the order failed to contain the disputed term. *Brewer*, 165 Ill. 2d at 103. In *Brewer*, the trial court's order, which settled the case, dismissed the plaintiff's lawsuit with prejudice and stated that, in return, the defendant agreed to pay the plaintiff a certain amount. However, the order did not list, as a term, the defendant's resignation from his job. *Brewer*, 165 Ill. 2d at 103. Hence, our supreme court reversed the trial court's subsequent order that he resign. *Brewer*, 165 Ill. 2d at 107. By contrast, in the case at bar, the court's April 24, 2015, order did not set forth the terms of the parties' agreement. Thus, the terms were properly the subject of the evidentiary hearing, which the trial judge held, and from which she made her finding.

¶ 72 As a result, we cannot find that the trial court's ruling was against the manifest weight of the evidence.

¶ 73                                    CONCLUSION

¶ 74 For the foregoing reasons, we affirm the trial court's order enforcing the settlement.

¶ 75 Affirmed.