2021 IL App (1st) 200797

FIRST DISTRICT
SIXTH DIVISION
April 30, 2021

No. 1-20-0797

| | | |
|---|---|---|
| TERRY ZEMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CH 04173 |
| | ) | |
| FRANCISCO ALVAREZ DIAZ and | ) | |
| BRADDOCK INVESTMENT GROUP, INC., | ) | Honorable |
| | ) | Neil H. Cohen, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Oden Johnson concurred with the judgment and opinion.

## OPINION

¶ 1 Plaintiff, Terry Zeman, filed a petition pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2018)), seeking to vacate the dismissal of his complaint for specific performance of a land sales contract. The trial court denied the petition, finding no meritorious defense and no diligence in filing the petition. On appeal, Zeman contends that the court should have granted his petition where (1) his attorney had no express or apparent authority to sign the settlement agreement on his behalf; (2) he did not ratify his attorney's execution of the settlement agreement; and (3) he was diligent in filing his petition. For the following reasons, we affirm.

¶ 2                                          I. JURISDICTION

¶ 3 On June 5, 2020, the trial court entered its order denying Zeman's section 2-1401 petition. Zeman filed his notice of appeal on July 1, 2020. Accordingly, this court has jurisdiction pursuant

to Illinois Supreme Court Rule 304(b)(3) (eff. Mar. 8, 2016), governing appeals from a judgment granting or denying a petition for relief under section 2-1401 of the Code.

¶ 4                                    II. BACKGROUND

¶ 5    On March 11, 2014, Zeman filed a complaint for specific performance of a contract to purchase real property commonly known as 1810 W. Erie Street in Chicago, Illinois. Zeman was the buyer, having received an assignment of defendant Braddock Investment Group, Inc.'s (Braddock), rights under the contract, and defendant, Francisco Alvarez Diaz, was the seller. Braddock subsequently filed a counterclaim for breach of contract against Zeman for failing to abide by the terms of the assignment. Attorney Peter Faraci filed an appearance on behalf of Zeman on July 26, 2018.

¶ 6    According to Zeman, the parties began negotiations for a settlement of all their claims in late 2018. Faraci was authorized to settle for "$372,000 all in" as indicated in an e-mail dated February 25, 2019. On March 5, 2019, Faraci sent Zeman an e-mail with the latest counteroffer from Braddock and Alvarez Diaz. In response, Zeman asked Faraci about his own counteroffer whereby Zeman would pay $372,000 to Alvarez Diaz and $15,000 to Braddock. At the final pretrial conference on April 15, 2019, attorneys for Braddock and Alvarez Diaz informed the court that the claims of all parties have been settled. The trial court entered the following order:

"[B]oth attorneys [for Alvarez Diaz and Braddock] reporting to the court that the claims of all parties have been settled, plaintiff's counsel present by conference call and confirming the case's resolution and agreement for the entry of an order dismissing all claims, it is hereby ordered that: all claims and counterclaims are dismissed. The trial dates of April 22, 2019 thru April 26, 2019 are hereby stricken."

¶ 7     Following the dismissal, the parties communicated through e-mail to finalize the details of their agreement. On April 17, 2019, Faraci sent the following to Nathan Neff, Alvarez Diaz's attorney: "Please review the dismissal order I had prepared and let me know if we can convert it to a settlement agreement ASAP. Also need the contract that was being executed today by the sellers." On April 18, 2019, Faraci sent an e-mail to Zeman and to another attorney who worked with Zeman, Leonard Litwin, stating "Attached please find the new contract along with the Addenda that I would like to attach when we return. This new clean contract gives me a second means of enforcement of the contract as we can simply record it if their [*sic*] is a default, in addition to the court's enforcement as well." Faraci asked Zeman and Litwin to "[p]lease review the documents and advise."

¶ 8     Later that day, Neff e-mailed Faraci: "I've take [*sic*] a run at a settlement agreement. Please let me know what you think." Neff also contacted attorney Mila Novak, who was conducting the closing of the purchase. He informed her that

> "the essential terms are $372,000—notably NOT the $372,500 that [Alvarez Diaz] had been insisted on in a year 2014 settlement proposal. Zeman's payment of the $372,000 to [Alvarez Diaz] and the $15,000 to Braddock is to made [*sic*] at or before the May 17, 2019 Closing. Given this specific time and location—the Settlement Agreement supersedes one paragraph of the Rider #8 which had permitted the parties to Close on a non-descript mutually convenient date and time. That's not the case here. *** I'm told that the Closing is set to proceed on May 17th *** however I don't know whether you and [Faraci] have agreed on a specific time for that. Please keep me posted on any developments."

A couple of hours later, Faraci informed Novak that "I am waiting for [Zeman's] review of the contract, but we can set the closing for any time 12 or after."

¶ 9    Faraci and Robert Haney, attorney for Braddock, reviewed Neff's draft of the settlement agreement and each made some changes. After Haney submitted his changes, Faraci e-mailed Haney and Neff: "Acceptable to Zeman. Let us know Nate." On April 19, 2019, Neff told Faraci:

"I believe that the Settlement Agreement can be executed by the parties, perhaps in short order. *** I think you have or are confirming that the Settlement Agreement and Mutual Release document that I forwarded yesterday is acceptable to Mr. Zeman. Braddock has confirmed it. I'll forward to [Alvarez Diaz] for his review and signature."

Neff also "attached an updated version of the settlement agreement, after edits by all counsel."

¶ 10    On May 2, 2019, Neff e-mailed Faraci:

"I appreciate that we're settled. We've exchanged a written agreement that you and Mr. Haney have both confirmed as acceptable to your clients. My client has signed it and I have provided you with a copy of same. Another copy is attached. You've confirmed the case as settled to Judge Cohen, who then dismissed the case pursuant to same. And then Mila Novak and [Alvarez Diaz] have moved forward in reliance of all of it—with the preparation of a land sales contract—that has been signed by Mr. Zeman—and the scheduling of a Closing for May 17th, the date set in the written settlement agreement exchanged. For whatever reasons, however, I have not yet received a copy of the settlement agreement signed by Mr. Zeman. Your e-mail below expressed some confidence that we'd have it last week."

Faraci responded, "I have signed a copy as the authorized agent. It took forever to get the contract signed and I will get his signature, but this should suffice for now." Haney informed Neff that he "spoke with Peter Faraci just now and advised him that his signature is not sufficient and that Braddock may have to take further action if we do not promptly receive the settlement agreement

executed by Zeman." Neff, however, assured Haney that "Mr. Faraci is counsel for Mr. Zeman, and authorized by Mr. Zeman to act in his stead."

¶ 11    On May 6, 2019, Novak sent the following e-mail to Faraci:

"Please let this email also serve as notice that the City of Chicago just posted the attached violation notice of lead hazards found in the property. Attached is also the revised lead disclosure form updated accordingly. Paragraph 22a) of the Contract shall also be deemed modified to reflect that the parties have received actual notice of this violation notice of lead hazards found in the property that has not been corrected. Since Mr. Zeman is taking this property in as-is condition, I presume this will not impact the scheduled closing on 5/17/19."

¶ 12    On May 16, 2019, one day before the scheduled closing date, Faraci e-mailed Zeman: "I'm hoping to get some direction from you by the end of the business day. If I do not hear from you I will send a letter formally requesting an extension of the due diligence and closing dates for at minimum one week unless I hear otherwise from you." Zeman responded, "As you know this all was discovered Tuesday at the walk through." He asked for "14-30 days" in order "to review the docs" and "investigate the lead remediation & lead poisoning to the little girl." His e-mail continued:

"Where are the docs that you referred to;

Where is the mutual release?

Where is the assignment of the lease and hold harmless doc?

\*\*\*

Furthermore, I NEVER asked/pushed to settle & not go to trial. Where did you get this understanding from?

Where is the settlement agreement that you speak of? Please forward I've never seen a copy.

\*\*\*

PLEASE send me everything you have ASAP and cc Leonard [Litwin]."

On May 16, 2019, Faraci responded: "Here are the docs that I have in my possession." There were five attachments to the e-mail, including the settlement agreement.

¶ 13    Later that day, Faraci e-mailed Zeman and Litwin:

"Per [Zeman's] text now, I will request an extension of time to close for a few days. I fully expect their response to be the same as it was with [Litwin], which is that we are in breach as of 1 o'clock tomorrow for failure to show up, and they will declare the contract null and void. ***

Upon their assertion, I will record the contract on Monday. At that point, I will compile a final bill for submission and will await your direction as to who will be moving forward to represent you in future litigation/negotiation."

The next morning, Zeman responded, "My text never said that. *** I suggest we schedule closing for the week of June 3. I'm unavailable next week due to being out of town for the long Memorial Day weekend." In another e-mail, he wrote: "Also, where is the settlement agreement. I don't believe that I've ever seen it. Please forward to both Leonard and I ASAP."

¶ 14    Later that morning, on May 17, 2019, Faraci answered, "Attached are all the documents requested. You and I have had several conversations regarding the settlement, the dismissal and the subsequent contract executed consistent with the settlement agreement." He attached four documents, including the settlement agreement. About one hour later, Faraci sent another e-mail to Zeman and copied Litman:

"Just sent you a text. Let me know soon if I am telling them that we are not attending [the closing] owing to their failure to provide reasonable accommodations for this newly discovered issue or not. If I do not hear from you by 11, I will do so to protect your interests.

Quick question, is [Litman] actually participating in this conversation as counsel as well?

Reason I'm asking is that I have had not a single response to any of these several emails

back and forth."

Litwin responded, "[Zeman] has spoken to me on numerous occasions about this issue and I have seen all the emails and documents. I agree with closing today as I believe [Zeman] is protected as the child's lead issue predates [Zeman] purchasing the property. I have recommended he close, give 30 day notices to the tenants effective 6-30-19 and then proceed as he sees fit to rehab the property and re rent it out."

¶ 15    Zeman did not appear for the scheduled closing on May 17, 2019. However, he continued efforts to purchase the property under the contract, but he and Alvarez Diaz could not agree to new terms. In June, Faraci informed Zeman that he would be withdrawing as counsel due to health issues. Defendants had also filed motions to enforce the settlement agreement, which were continued to July 9, 2019. In that order, the court stated that any failure to appear by Zeman or through new counsel "shall be considered an acquiescence to the two pending motions by defendants which are entered and continued to July 9, 2019."

¶ 16    On July 9, 2019, when neither Zeman nor new counsel made an appearance, the trial court entered a default judgment against Zeman and granted the motions to enforce. On July 10, 2019, Zeman's new counsel filed an appearance and a motion to vacate the default judgment pursuant to section 2-1301 of the Code (735 ILCS 5/2-1301 (West 2018)). The court granted the motion to vacate on July 17, 2019.

¶ 17    On August 1, 2019, Zeman filed his section 2-1401 petition. An amended motion seeking to vacate the dismissal order of April 15, 2019, vacate the settlement agreement, and reinstate the case was filed on August 12, 2019, with Zeman's affidavit attached. In it, he stated that on April 12,

2019, he, Alvarez Diaz, and Braddock agreed to the following settlement terms: sales price of $372,000; additional $15,000 from Zeman to Braddock; "As is, no more inspections;" no attorney review; Alvarez Diaz's wife as co-owner; updated title commitment; and "Same terms as in reinstatement letter of 8/9." Zeman stated that he "did not approve of any additional settlement terms related to this lawsuit." He further stated that although he signed a contract to purchase real estate, "Faraci did not discuss any other terms for a settlement agreement with me." He acknowledged that Faraci forwarded "email correspondence dated May 16-17 that purportedly had attached a copy of a settlement agreement" and that he had an unsigned copy of a settlement agreement in his possession. However, he did not recall reviewing a settlement agreement in May 2019 and stated that he did not recall seeing the settlement agreement until his new counsel presented it to him in mid-July 2019.

¶ 18    The trial court held an evidentiary hearing on the matter in which Zeman, Litwin, and Faraci testified. Faraci testified that he had discussed with Zeman in the weeks before May 2, 2019, that there would be a written settlement agreement. Faraci's belief that he was authorized to negotiate a settlement agreement was "based upon the fact that I had been representing him in this matter. We've had several conversations regarding the sum and substance of what that settlement agreement would be." He also made Zeman aware that his complaint would be dismissed and that the settlement agreement would contain additional terms such as releases. When asked why he thought the settlement agreement was in Zeman's best interest, Faraci replied, "[b]ecause it provided us with a time frame for which the seller should perform. It was a contract at the original asking price, not taking into consideration an increase in valuation, and it provided us with a reduced assignment fee." Faraci acknowledged that he did not receive express authority from Zeman to sign the settlement agreement, but he believed he had the authority based upon his involvement in the matter.

¶ 19    Zeman testified that he never gave express authority to Faraci to execute the settlement agreement and he would never enter an agreement with the terms set forth therein. He agreed to and signed only the land sales contract. He further denied that Faraci kept him apprised of the settlement negotiations or the discussion of its terms. He acknowledged that after becoming aware of the settlement agreement, he did not fire Faraci but instead directed him to record the land sales contract, which was done. Also, Zeman acknowledged that during this time, he took vacations to Hawaii and other countries before he acquired new counsel in July 2019.

¶ 20    After oral argument, the court denied the petition. Relying on *Condon & Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923, the court found that Zeman failed to present a meritorious defense and he lacked diligence in filing the section 2-1401 petition. The trial court explained:

"I'm sorry to say that I find Mr. Zeman to be—to lack any credibility at all in this matter. I find that he plays angles. And that's fine, as I said before, he's entitled to. But when I have to determine credibility about what he knew, I take a look at what he said he knew, and what he—how he acted. He said a number of things in terms of what he knew, much of which is contradictory. And then there's the actions that Mr. Haney referred to, and Mr. Neff, about if you really care, if you're really diligent, you wouldn't go off to Barcelona and Morocco and wherever he wanted to go while this was pending. You would be attending to business. And if you were relying upon Mr. Litwin to attend to your business, well then that's the proof in the pudding. And Mr. Faraci, before he left, also proof in the pudding, which both of them told him to go through with it, that he was really flirting with danger.

In a real sense, I find that Mr. Zeman was told exactly what could happen to him. He just didn't do it because he's a better negotiator than everybody else. But in this case, he had someone who is pulling for him and who not only had a sense of actual authority, but at least

apparent authority, per the Condon case. And certainly someone who was relied upon by Mr. Zeman and the other side as having that authority.

No one has mentioned the fact that part of apparent authority, as mentioned by Justice Gordon in the Condon case, is what third parties think. *** An apparent agent is one who, whether authorized or not, reasonably appears to third persons to be authorized to act, and as a result of the acts of that person, does act. And they're relied upon. That's exactly what happened.

Further, I find that Mr. Zeman, by his actions, ratified these apparent authority actions of Mr. Faraci *** [and] per the arguments of Mr. Haney with regards to the dismissal of the counterclaim, [received] benefits he got that he wouldn't have gotten otherwise from the settlement agreement."

The court found Faraci credible when he testified that he thought he had express authority to execute the settlement agreement on behalf of Zeman, but he did not actually have it. In so testifying, Faraci "put himself on the line by admitting that. I give that a whole lot of credibility." The court continued:

"At the same time, Mr. Faraci *** told Mr. Zeman exactly about the settlement agreement and discussed the terms and they talked about it. We can understand why Mr. Faraci thought he had the authority, why he acted as if he had the authority, even if he didn't. ***

In other words, we can understand why everybody relied upon Mr. Zeman doing the right thing for the right reason. And I can understand why it wasn't done after listening to Mr. Zeman."

¶ 21 For the reasons enunciated by the court and set forth in defendants' briefs, the trial court denied Zeman's petition. On June 5, 2020, the court entered a written order denying the petition. This appeal followed.

¶ 22                                    III. ANALYSIS

¶ 23     Section 2-1401 of the Code sets forth a statutory procedure by which final judgments may

be vacated "after 30 days from the entry thereof." (Internal quotation marks omitted.) *Smith v.*

*Airoom, Inc.*, 114 Ill. 2d 209, 220 (1986). A petition pursuant to section 2-1401 seeks to bring before

the trial court facts not appearing in the record that, if known to the court at the time judgment was

entered, would have prevented that judgment. *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill.

2d 85, 94 (2006). A section 2-1401 petition must set forth specific factual allegations supporting the

following elements: (1) a meritorious defense or claim, (2) due diligence in presenting the defense

or claim to the court, and (3) due diligence in filing the section 2-1401 petition. *Id.* We review the

trial court's determination for abuse of discretion. *Smith*, 114 Ill. 2d at 221.

¶ 24     First, Zeman contends that he has a meritorious defense because Faraci had no authority to

execute the settlement agreement on his behalf. An attorney's authority to represent a client in

litigation is distinct from the authority to settle a lawsuit. *Brewer v. National R.R. Passenger Corp.*,

165 Ill. 2d 100, 105 (1995). In order to settle a claim, "the attorney must receive the client's express

authorization to do so." *Id.* "Where a settlement is made out of court and is not made part of the

judgment, the client will not be bound by the agreement without proof of express authority."

(Internal quotation marks omitted.) *Kulchawik v. Durabla Manufacturing Co.*, 371 Ill. App. 3d 964,

969 (2007).

¶ 25     Zeman contends that the settlement agreement at hand is invalid because it was not

negotiated in court and he did not give Faraci express authority to execute it. His own testimony at

the evidentiary hearing, however, demonstrated that he gave Faraci the authority to settle. Zeman

acknowledged that the parties began negotiations for a settlement of all their claims in late 2018,

and Faraci was authorized to settle for "$372,000 all in." When presented with the latest counteroffer

from Braddock and Alvarez Diaz, Zeman asked Faraci about his own counteroffer whereby Zeman would pay $372,000 to Alvarez Diaz and $15,000 to Braddock. In fact, the terms in the settlement agreement and in the new land sales contract reflected exactly what Zeman counteroffered during the negotiations: $372,000 to Alvarez Diaz and $15,000 to Braddock.

¶ 26    While Zeman admits that he authorized Faraci to negotiate a new sales contract, he contends that he did not give Faraci the authority to negotiate a settlement. Zeman, however, was able to pursue a new land sales contract precisely because the parties had agreed to dismiss claims stemming from the original contract. As Zeman's new counsel later acknowledged, the new contract was the fruit of the settlement agreement. The two agreements cannot be separated when considering the issue of Faraci's authority to act in this case.

¶ 27    Zeman further argues that, even if Faraci had the general authority to negotiate on his behalf, he did not have the authority to sign the settlement agreement and bind Zeman to the terms contained therein without his express approval. Zeman asserts that he gave no such authority and was not even aware of the settlement agreement until May 16 or 17, 2019. We find *Sakun v. Taffer*, 268 Ill. App. 3d 343 (1994), instructive. *Sakun* found apparent authority to act under similar circumstances.

¶ 28    In *Sakun*, the plaintiffs filed an action seeking an accounting, injunction, and other relief. On February 21, 1992, the court entered an agreed order that reset the matter pursuant to settlement negotiations. *Id.* at 344. A number of agreed orders followed, and on January 5, 1993, an agreed order was entered that " '[p]ursuant to the settlement agreement appended hereto, this cause is dismissed.' " *Id.* at 345. Attached was a document titled " 'Settlement Agreement' " signed by each of the plaintiffs and purportedly signed by the defendants. *Id.*

¶ 29    On January 29, 1993, the plaintiffs filed an emergency motion for rule to show cause why the defendants should not be held in contempt for failure to comply with certain terms of the

settlement agreement. On February 22, 1993, the court found the defendants in contempt, and they were ordered to appear on April 5, 1993. *Id.* The court subsequently issued an order for the defendants' attorney to appear. However, neither the attorney nor the defendants appeared at any court dates from January to May 1993. *Id.* at 346. On May 26, 1993, another law firm made an appearance on behalf of the defendants, and on June 15, 1993, they filed a section 2-1401 petition to vacate the January 5, 1993, judgment order and to declare the settlement agreement void. *Id.*

¶ 30    In the petition, the defendants alleged that they did not authorize settlement of the matter and were unaware of the settlement. In their affidavits, they acknowledged that they knew their former attorney was engaged in settlement negotiations, but they did not authorize him to sign the settlement agreement on their behalf. *Id.* They did not see the settlement agreement until February 1993, nor did they know that their attorney had signed the agreement until May 1993. *Id.* Their former attorney stated in his affidavit that he signed the settlement agreement on the defendants' behalf " 'because of an erroneous belief that the form of Settlement Agreement I signed was acceptable to the Taffers. At the time I signed the Settlement Agreement, I did not have authority from the Taffers to agree to or sign that Agreement on their behalf.' " *Id.* at 347.

¶ 31    Plaintiffs filed a response and attached correspondence between their attorneys and defendants' attorney. In a November 25, 1992, fax from the defendants' attorney, he stated: " 'Here is the Sakun-Taffer proposed settlement agreement. Please note the proposed changes on pages 4 & 5. If this is acceptable, we have a deal.' " *Id.* at 348. Similarly, other correspondence indicated that the defendants were apprised of the negotiations and gave input to their attorney regarding the agreement's terms. *Id.*

¶ 32    The defendants filed responses asserting that they never authorized their attorney to settle the case on the terms in the draft attached to the November 25, 1992, fax. They denied knowledge

of or participation in any discussions indicated by the plaintiffs' correspondence. *Id.* at 348-49. After a hearing, the trial court denied the defendants' petition to vacate, finding that their attorney had apparent authority to sign the settlement agreement on their behalf. *Id.* at 349.

¶ 33    In affirming the trial court's determination, this court noted that "[t]he fact that authority to represent a client in litigation is separate and independent from the authority to settle a case does not preclude an attorney from possessing the authority for both." *Id.* at 350. The nature and extent of any agency relationship "may be shown by circumstantial evidence, with reference to the situation of the parties, the property and the acts of the parties." *Id.* at 351. In other words, courts will find that an attorney had the authority to act where "circumstances of the case constituted events and actions which would reasonably lead a person to believe" that the attorney was acting on behalf of his clients. *Id.* The trial court was in a "superior position to weigh the evidence concerning defendants' claim." *Id.* at 352.

¶ 34    The court noted that the defendants acknowledged their attorney's authority to enter settlement negotiations, which were ongoing for almost a year. They also admitted that they received communications and copies of the proposed settlement agreement. Accordingly, their attorney's apparent authority to sign the settlement agreement on behalf of the defendants "was the logical implied extension of his express authority" under the circumstances of the case. *Id.*

¶ 35    The circumstantial evidence shows that Faraci, like the attorney in *Sakun*, had apparent authority to execute a settlement on behalf of Zeman. Faraci participated in settlement negotiations starting in late 2018, with express authority from Zeman to do so. These discussions led to the April 15, 2019, dismissal order which, according to e-mails, Faraci drafted. Zeman continued to allow Faraci to act on his behalf, and Faraci indicated that he kept Zeman apprised of ongoing negotiations. "Where a party stands by silently and lets his attorney act in his behalf in dealing with another in a

situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority to a third person." *Kulchawik*, 371 Ill. App. 3d at 971.

¶ 36    The record also shows that defendants relied on Faraci's apparent authority to act on behalf of Zeman. After the April 15, 2019, dismissal order, Faraci immediately requested the drafting of a settlement agreement and began negotiations on a new land sales contract. Due to the parties' agreement to settle, Braddock dismissed its counterclaim, and Alvarez Diaz began negotiations on a new land sales contract with Zeman. Zeman and Alvarez Diaz subsequently executed a new contract that contained terms Zeman found favorable. Notably, Neff expressed his belief that Faraci had the authority to act on behalf of Zeman, and even Faraci himself believed he had the authority to execute the settlement agreement. After placing Faraci in a situation where he may be presumed to have authority to act, Zeman cannot now deny Faraci's apparent authority as to defendants. See *id.*

¶ 37    *Brewer* and *Blutcher v. EHS Trinity Hospital*, 321 Ill. App. 3d 131 (2001), cases cited by Zeman, have no application here because they are not apparent authority cases. In *Brewer*, one of the terms of the settlement agreement was that the plaintiff would quit his job with the defendant. *Brewer*, 165 Ill. 2d at 103. The plaintiff's attorney, however, stated that the issue was never discussed during the settlement conference and, in any case, he was not authorized to compromise the plaintiff's job. *Id.* As a result, there could be no presumption "that plaintiff's attorney spoke for plaintiff on this point." *Id.* at 106.

¶ 38    In *Blutcher*, the plaintiff's attorney confessed that he had settled the case without the plaintiff's authorization and kept the money. *Blutcher*, 321 Ill. App. 3d at 134. Not only did the plaintiff not sign the agreement, "he was completely unaware of ongoing settlement negotiations" and the executed agreement. *Id.* at 139. Although the defendant tried to argue apparent authority in

the case, the court found that the theory did not apply where "the principal's consent to or knowing acquiescence in the agent's exercise of authority [was] lacking." *Id.* at 141.

¶ 39    Unlike the plaintiffs in *Brewer* and *Blutcher*, Zeman had knowledge of and participated in ongoing negotiations between the parties. This is confirmed by an e-mail in which Faraci told Zeman that "[y]ou and I have had several conversations regarding the settlement, the dismissal and the subsequent contract executed consistent with the settlement agreement." He made Zeman aware that the settlement agreement would contain additional terms such as releases. Faraci also thought the settlement agreement was in Zeman's best interest "[b]ecause it provided us with a time frame for which the seller should perform. It was a contract at the original asking price, not taking into consideration an increase in valuation, and it provided us with a reduced assignment fee." The evidence supporting Faraci's apparent authority to act is in stark contrast to the lack of such evidence in *Brewer* and *Blutcher*.

¶ 40    Furthermore, Zeman ratified Faraci's act by not repudiating the agreement once he had knowledge of it and accepting the benefits that flowed therefrom. *Condon*, 2016 IL App (1st) 151923, ¶ 65. " '[R]atification of an unauthorized act is tantamount to an original authorization and confirms what was originally unauthorized.' " *Kulchawik*, 371 Ill. App. 3d at 970 (quoting *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 14 (2004)). Ratification may be inferred from the surrounding circumstances. *Id.*

¶ 41    The trial court entered the dismissal order on April 15, 2019, and almost immediately thereafter Faraci began negotiations on a new land sales contract. The new contract contained material terms that Zeman wanted including $372,000 to Alvarez Diaz and $15,000 to Braddock. Furthermore, as Faraci stated in an e-mail to Zeman, "[t]his new clean contract gives me a second means of enforcement of the contract as we can simply record it if their [*sic*] is a default, in addition

to the court's enforcement as well." Faraci did in fact record the contract despite Zeman's failure to close on the scheduled date. Faraci believed the new contract was beneficial to Zeman and Zeman's other attorney, Litwin, agreed with Faraci after viewing "all the emails and documents." Litwin recommended to Zeman that he close on the property.

¶ 42    Zeman's actions show that he also believed the new land sales contract was beneficial to him. He discovered the settlement agreement on May 16 or 17, 2019, but did not seek to void the agreement or vacate the April 15, 2019, dismissal order. Instead, he continued to pursue purchase of the property from Alvarez Diaz by negotiating new terms. Zeman accepted the benefit that the settlement agreement gave him, namely the ability to execute a new land sales contract, even though he had not signed the document. As such, Zeman ratified the settlement agreement.

¶ 43    For these reasons, we affirm the trial court's determination that Zeman has not shown a meritorious defense or claim to support his section 2-1401 petition.

¶ 44    Zeman also has not shown due diligence in filing his section 2-1401 petition. We recognize that "[n]o bright-line rule exists for judging whether a petitioner has acted diligently. Rather, due diligence is judged by the reasonableness of the petitioner's conduct under all of the circumstances." *Paul*, 223 Ill. 2d at 99-100. However, there are two principles we may follow: "first, that a petitioner seeking relief from judgment must do so expeditiously; and second, that the due-diligence inquiry is, in the end, case specific." *Id.* at 101.

¶ 45    Here, Zeman did not seek relief expeditiously. He does not dispute that he learned of the settlement agreement on May 17, 2019, at the latest. Faraci also stated that he sent Zeman a copy of the agreement several times by that date, although Zeman asserts that he did not see a copy until July 2019. We note, however, that the trial court did not find Zeman to be credible. As the factfinder, the trial court is in the best position to determine the credibility of witnesses and the weight of their

testimony. *In re Marriage of Benjamin*, 2017 IL App (1st) 161862, ¶ 26. This court will not substitute its judgment for that of the factfinder by reweighing the credibility of witnesses. *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 829 (2008).

¶ 46    Although Zeman had knowledge of the settlement agreement on May 17, 2019, he waited almost three months until August 1, 2019, to file his section 2-1401 petition. At no time during the court proceedings that took place between May 17 to August 1, 2019, did Zeman or his counsel seek to challenge that agreement or vacate the new land sales contract. Instead, Zeman continued to pursue purchase of the property from Alvarez Diaz with a new closing date. He also admittedly took a number of vacations out of the country during that period.

¶ 47    Zeman argues that he was diligent given his reliance on Faraci as his attorney and the fact that Faraci did not advise him of his right to challenge the settlement agreement. He asks this court to follow *Pirman v. A&M Cartage, Inc.*, 285 Ill. App. 3d 993 (1996), and take account of Faraci's inaction when considering whether Zeman was diligent in filing his petition. *Pirman*, however, involved a suspect default judgment. The court in *Pirman* noted that the current trend has "been to relax the due diligence standard where necessary to prevent the unjust entry of default judgments and to effect substantial justice." *Id.* at 1003. Zeman is not seeking to vacate a default judgment.

¶ 48    Furthermore, it is apparent from the record that Zeman is someone familiar with how contracts work. He is an astute businessman who would not wait almost three months for his attorney to act if he believed his interests had been compromised. In any event, Zeman's mere reliance on his attorney does not in itself affect the due diligence inquiry. Every litigant has a duty to follow the progress of his case and not "assume that his counsel is doing everything which is necessary and proper in the conduct thereof." *Sakun*, 268 Ill. App. 3d at 353. Under these circumstances, we find that Zeman has not shown diligence in filing his section 2-1401 petition.

¶ 49                           IV. CONCLUSION

¶ 50     For the foregoing reasons, we find that Zeman has not presented a meritorious defense to the dismissal, nor has he shown due diligence in filing his section 2-1401 petition. Therefore, we affirm the judgment of the circuit court denying the petition.[1]

¶ 51     Affirmed.

---

[1]In his brief, Alvarez Diaz requests that this court remand the matter for determination of attorney fees pursuant to the settlement agreement. We decline the request as the only issue before us in this appeal is the trial court's denial of Zeman's section 2-1401 petition.

**No. 1-20-0797**

| | |
|---|---|
| **Cite as:** | *Zeman v. Alvarez Diaz*, 2021 IL App (1st) 200797 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CH-04173; the Hon. Neil H. Cohen, Judge, presiding. |
| **Attorneys for Appellant:** | Julianne M. Dailey, of Horwood Marcus & Berk Chtrd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Nathan I. Neff, of Neff Law Group PC, of Chicago, for appellee Francisco Alvarez Diaz.<br><br>Robert E. Haney, of Noonan & Lieberman, Ltd., of Chicago, for other appellee. |