2021 IL App (1st) 191814-U
No. 1-19-1814
December 30, 2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PATRICIA JACKSON, Individually and on behalf of P & A BILLING, INC., P.J. MEDICAL BILLING SERVICES, LLC, | ) ) ) | Appeal from the Circuit Court Of Cook County. |
| | ) | No. 2012 CH 29327 |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| ANTHONY LAZZARA, P.A. MEDICAL | ) | Sanjay Tailor, |
| BILLING SERVICES, INC. | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE WALKER delivered the judgment of the court.
Justice Pucinski and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding that the parties reached a binding oral agreement, the terms of which allowed the parties to compete for clients of a dissolving corporation instead of distributing the value of the corporation's customer accounts according to the parties' respective equitable interests.

¶ 2    Plaintiff Patricia Jackson filed a complaint, individually and on behalf of P & A Billing, Inc. (P & A Billing), and P.J. Medical Billing Services, LLC against Anthony Lazzara and P

A Medical Billing Services, Inc. (P A Medical Billing) seeking a judicial dissolution of P & A Billing as well as an accounting and equitable distribution of the assets of P & A Billing. Lazzara filed an answer and counterclaim also seeking a dissolution of P & A Billing and an equitable distribution of the assets. Following a bench trial on February 28, 2019, the trial court found that a draft settlement agreement prepared by Lazzara's attorney accurately reflected the terms of an oral agreement the parties reached on January 18, 2008. This draft settlement agreement stated that the parties would compete for P & A Billing clients and release all other claims. Subsequently, the trial court ruled Jackson was not entitled to recover any damages based upon an inequitable division of the fair market value of P & A Billing. Jackson now appeals, arguing that the trial court erred in finding that the parties had entered into an oral agreement. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Jackson and Lazzara formed P & A Billing on August 15, 1986, with each having a 50% equity interest in the corporation. P & A Billing was engaged in the business of providing medical billing and collection services to professionals in the health care industry. The principal place of business and registered office of P & A Billing was located at 2010 N. Harlem Avenue, Elmwood Park, Illinois. Jackson served as its president and Lazzara as its chief financial officer. Jackson and Lazzara successfully operated P & A Billing until 2008.

¶ 5        In March of 2004, Lazzara signed a Medical Manager End User License Agreement on behalf of P & A Billing for the use of a software program entitled The Medical Manager Version 10. Under the terms of this License Agreement, P & A Billing was granted a license to use the Medical Manager Billing Service System software program, subject to various terms

2

and conditions which, among other things, barred P & A Billing from copying or transferring the software.

¶ 6    On August 28, 2007, Jackson filed a complaint in the Circuit Court of Cook County seeking a dissolution of P & A Billing and was represented by Jeffrey Deer and Curt Eisenberg. Eisenberg died on April 12, 2011.

¶ 7    On November 13, 2007, Lazzara incorporated a new company, P A Medical Billing, to engage in the same kind of business being conducted by P & A Billing. On December 26, 2007, Lazzara filed an answer and counterclaim and was represented by Joseph A. Morris. In his counterclaim, Lazzara requested that the circuit court "make an equitable distribution between shareholders of the assets and/or value of the assets of the corporation."

¶ 8    On the afternoon of Friday, January 18, 2008, Jackson, Deer, Eisenberg, Lazzara, and Morris attended a settlement conference at Deer's office. During the meeting, Deer and Eisenberg asked Morris to prepare a draft of an agreement and draft notices to employees and clients.

¶ 9    On the following Monday, January 21, 2008, Morris sent an email to Deer attaching and enclosing a draft settlement agreement, a draft joint letter to clients, and a draft joint letter to employees for review and approval. The draft agreement stated, among other things, that the parties would compete for P & A clients and release all other claims. The draft settlement agreement was never signed by Jackson or Lazzara. The draft joint letters to clients and employees were never signed by Jackson.

¶ 10    At noon on Friday, January 25, 2008, Morris sent Deer an email stating:

3

"We agreed a week ago that notice letters would be sent to the company's clients and employees on Tuesday, January 22. I kept my promise, drafting those notices and getting them to you on Monday, January 21 along with all the other materials that Patty Jackson, Curt Eisenberg, and you asked for.

You acknowledged receipt of them, and you acknowledged that they conformed to our agreements of last Friday. When we last spoke on Wednesday, January 23rd, with Curt Eisenberg on the line, you asked to have until yesterday, January 24th, in which to make any last comments on the notices.

It is now noon on Friday, January 25. It is pay day, and employees are clamoring for their pay checks. No further communication has been received regarding the notices.

Accordingly, Mr. Lazarra is now releasing to the employees their pay checks and termination notices. He is also today making the company's final payments to the employee IRAs for the last period of 2007. He is also today dispatching the notice letter to clients."

¶ 11     At 2:44 p.m. on Friday, January 25, 2008, Deer sent Morris an email stating, "please be advised that the letters have not been approved by us and our client, you're sending them out today without our approval is without consent." Morris responded to Deer at 2:48 p.m. asking him to send any changes to the letters as soon as possible. Deer responded at 3:41 p.m., stating:

"Again, we have not agreed to the letter nor the agreement.

4

in a few words we need to move closing date to at least March 15. we cannot set up new computers and software in the time before Feb 15 nor can we by law share the current software.

We are not in agreement to have [Lazarra] take the current phone [nor] he can get a new one as the company is dissolving and the number belonged to the company third we understand that he has been contacting Drs namely Dr. Goldstein.

as for value of the building can you have the last appraisal sent to us so we can expedite a new one."

¶ 12     On January 25, 2008, Lazzara mailed a letter to clients with the same language as the draft letter. Lazzara then began soliciting P & A Billing's clients to follow him to P A Medical Billing. Subsequently, Jackson issued her own letter to clients on February 8, 2008, in which she told the clients, among other things, that she had decided to divest herself of any business dealings with Lazzara, but as of the date of her letter, "an actual termination date had not been determined."

¶ 13     On February 15, 2008, Deer faxed a letter to Morris regarding their conversation earlier that day and demanded that Morris have Lazzara "cease and desist all activities regarding current PA Billing Clients until we have a fully signed agreement between the parties."

¶ 14     Up to the close of business on Friday, February 15, 2008, P & A Billing was an ongoing enterprise engaged in its normal business operation of providing medical billing services to all its clients, and all the clients being serviced were under contract with the corporation.

¶ 15    On the weekend of February 16, 2008, Lazzara entered the offices of P & A Billing installed a new server for the exclusive use of his new company, P A Medical Billing Services, and copied the entire memory from the original server of P & A Billing, including patient demographics, physician charges, payments to physician accounts and accounts receivable, to his new server. While company files were copied from the P & A Billing's server onto the new server for P A Medical Billing, Jackson had no access to the data on that second server.

¶ 16    On Monday, February 18, 2008, P A Medical Billing commenced doing business in the original offices of P & A Billing and Lazzara started servicing the client accounts originally owned and serviced by P & A Billing. When Jackson came to work that morning, she found her computer was locked out from accessing the client files Lazzara had transferred to his new server.

¶ 17    On February 26, 2008, Jackson and Lazzara received an email from Kelly Griffith of Final Support informing them that they were in violation of the Medical Manager End User License Agreement executed by P & A Billing. Hence, they were not able to maintain corporate accounts using the billing service.

¶ 18    On February 28, 2008, Jackson formed a new company, P.J. Medical Billing Services, LLC to engage in the same business conducted by P & A Billing. Out of 32 customers of P & A Billing in February 2008, 7 chose to go to Jackson's new company and 25 went to Lazzara's new company.

¶ 19    On April 25, 2008, Jackson and Lazzara entered into an agreement through emails exchanged between their counsel providing for the sale of the property located at 2010 N. Harlem Avenue in Elmwood Park to Lazzara. Jackson then vacated the property. In August

2008, Jackson and Lazzara entered into another separate agreement providing for the sale of all stock in publicly traded organizations previously held as part of a joint venture between the two of them and the net proceeds from the sale of those securities were divided.

¶ 20        On September 21, 2011, Judge Nancy Arnold set the case for trial to be commenced on January 23, 2012. On the January 23rd trial date, Deer could not proceed because his laptop computer and files had been ceased by the government. An order was entered pursuant to Section 2-1009 of the Illinois Code of Civil Procedure dismissing the entire case without prejudice. Following the dismissal, Jackson retained new counsel and refiled her four-count complaint on July 31, 2012.

¶ 21        Count I of Jackson's complaint sought an equal distribution of P & A Billing's fair market value as determined by the company's "book of business" or the value of customer accounts. Jackson argued that Lazzara breached his fiduciary duty by soliciting 85% of P & A Billing's "book of business" for his new company before a judicial dissolution of P & A Billing or settlement of the case. Count II sought an accounting from Lazarra and damages based on the income that he derived from servicing old clients from February 2008 through the date of judgment. Count III sought an accounting from Lazarra and damages based on his under-collection of receivables from the old clients after those clients took their business to P A Medical Billing. Count IV sought accounting and damages to compensate Jackson for the devaluation of her stock in P & A Billing caused by Lazzara's actions.

¶ 22        In October 2015, Lazzara moved for summary judgment on Count I of Jackson's complaint, arguing that Jackson was only entitled to half of the liquidated tangible assets of a

dissolving corporation, not half of the value of its customer accounts because those accounts were free to contract with another company.

¶ 23    On February 9, 2016, Judge Rita Novak granted Lazarra's summary judgment motion stating, "for the reasons set forth in the record, the asset liquidation valuation approach is mandated under Illinois law pursuant to Section 12.30 of the Business Corporation Act." Jackson filed a motion to reconsider, which the trial court denied. At the time of trial, Judge Tailor had replaced Judge Novak in this matter, and issued judgment on Counts I, II, and III of Jackson's complaint. As to Count I, Judge Tailor found Jackson's measure of valuation compelling, but held that "the Court need not decide the proper measure of valuation if the alleged settlement agreement and release *** have merit." Judge Tailor later found that the draft settlement accurately reflected the "terms of an oral agreement between Jackson and Lazzara achieved on January 18, 2008." Consequently, he held that Jackson was not entitled to any damages based on the inequitable distribution of the fair market value of P & A Billing. Jackson filed a motion to reconsider and vacate judgment, which the trial court denied. This timely appeal followed.

¶ 24                                    ANALYSIS

¶ 25    On appeal, Jackson argues that the trial court erred in finding that an enforceable oral agreement was entered into on January 18, 2008. Jackson maintains that the trial court's findings were opposed to the actual evidence, and in certain instances arbitrary, contrary to reason, or unsupported by any evidence. Specifically, Jackson argues that (1) an oral agreement could not have been reached because the signature of the parties was a condition precedent to the completion of an agreement, (2) there was no meeting of the minds because Jackson and

Lazzara did not speak to each other at the settlement conference, (3) there was no testimony as to what was orally discussed at the settlement conference concerning most of the provisions in the draft settlement, and (4) Jackson wanted an equitable distribution of the company's assets and would not have agreed to waive that right.

¶ 26    When reviewing the trial court's determination that parties reached an oral settlement agreement, this court will not overturn that finding unless it is against the manifest weight of the evidence. *K4 Enterprises, Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 312 (2009). See also *Spec-Cast, Inc. v. First Nat'l Bank & Trust Co.*, 128 Ill. 2d 167, 177 (1989) ("When reviewing the findings of the trial court in a bench trial in which the evidence is conflicting, this court will not disturb a trial court's findings and substitute its own opinions, unless the holdings of the trial court are manifestly against the weight of the evidence). A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). "Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Accordingly, in reviewing the trial court's findings, this court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn there from. *Id.* at 350-51.

¶ 27    A settlement agreement is governed by principles of contract law. *K4 Enterprises, Inc.*, 394 Ill. App. 3d at 313. For a contract to be enforceable, its material terms must be definite and certain. *Id.* A contract is "sufficiently definite and certain" if from its terms and provisions

and "under proper rules of construction and applicable principles of equity" the court can ascertain what the parties have agreed to do. *Id*. The existence of an oral contract and the intent of the parties are questions of fact that will not be disturbed unless they are against the manifest weight of the evidence. *Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2009). An oral settlement agreement is enforceable, and the lack of a written release does not control unless the parties intended to make a release a condition precedent to the agreement. *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146 (1997).

¶ 28   Jackson first argues that the trial court erred in finding an enforceable oral agreement where the evidence demonstrated that a signed writing was a condition precedent to the completion of an agreement. "Where the reduction of an agreement to writing and its formal execution is intended by the parties as a condition precedent to its completion, there can be no contract until then, even if the actual terms have been agreed upon." *In re Estate of Glassman*, 257 Ill.App.3d 102, 108 (1993). In this case, there is no evidence in the record that the parties intended that a signed written agreement be a condition precedent to the binding effect of the oral agreement. Additionally, there is no evidence that any attorney prior to or during the settlement conference required a signed writing as a condition precedent to an oral agreement.

¶ 29   The undisputed facts are that Jackson and Lazzara attended a settlement conference on January 18, 2008. Morris created a draft agreement and drafted joint letters following the meeting and sent them to Jackson's attorneys for review and approval on January 21. On January 25, Morris and Deer exchanged multiple emails regarding those documents. The trial court found the exchange of emails crucial to determining the existence of an oral settlement. Specifically, the trial court found Deer's email to Morris "more probative for what it does not

say than what it does say." In the exchange, Morris informed Deer that Lazzara was ready to move forward with the purported agreement. When presented with this information, Deer never mentioned a condition precedent of a signed writing as a reason Lazzara could not move forward. Instead, Deer requested moving the company's closing date back another month to give Jackson more time to set up her company and that Lazzara not retain the P & A Billing's phone number. It was not until February 15, 2008, the day P & A Billing was set to close, that Deer emailed Morris demanding a fully signed agreement. However, even in that email, Deer does not state that a signed agreement was ever a condition precedent to a settlement agreement. Deer's demand appeared to be an attempt to give Jackson more time prior to the dissolution.

¶ 30　　Simply because Morris was tasked with serving as the scrivener at the meeting and drafting an agreement afterward does not necessarily mean that the document was a condition precedent to an enforceable agreement. Parties can contemplate the execution of a written release or stipulation without the writing being a condition precedent to a valid settlement agreement. *Lampe*, 292 Ill. App. 3d at 147. "Obviously, to hold otherwise would foreclose courts from ever recognizing or enforcing oral agreements to settle." *Id.*

¶ 31　　Jackson attempts to distinguish this case from *Stone v. McCarthy*, 206 Ill. App. 3d 893 (1990). In *Stone*, the defendant's attorney submitted a draft settlement agreement. *Id.* at 895. Later, the plaintiff's attorney submitted a signed revised settlement agreement and the plaintiff moved to enforce it. *Id.* at 895-96. The defendant argued that the revised agreement did not evidence a settlement, but rather a counter-offer. *Id.* at 897. The trial court disagreed and enforced the settlement drafted by the defendant's attorney. This court affirmed.

11

¶ 32        Jackson argues that because she never signed the draft settlement agreement, and her attorneys did not submit a revised draft, there was no agreement. We disagree. Here, Morris drafted the settlement and sent it to Jackson's attorneys to ensure that the written document accurately reflected the terms already agreed upon, not to make the oral agreement enforceable. In *Stone*, the court enforced the defendant's attorney draft agreement despite neither party signing it. *Id.* at 903. The court found that the plaintiff's submission of the revised agreement was an attempt to reduce the oral agreement to writing, not to continue negotiations. *Id.* Similarly, the draft agreement here was the memorialization of the oral agreement reached at the settlement conference. Since the parties did not require a signed writing be a condition precedent to an oral agreement, Jackson did not need to sign the draft agreement to make the oral agreement binding. To disregard the oral agreement because one party does not sign a subsequent written agreement that was not a condition precedent "would have the effect of encouraging parties to act in bad faith, by casually entering into oral agreements to settle, secure in the knowledge that they could later change their minds and breach their promises." *Id.*

¶ 33        Jackson then argues that a signed writing as a condition precedent to a valid agreement was a commonsense requirement. She contends that given the facts of this case - involving a business that was generating millions of dollars in revenue over a period of 22 years - it would be a "matter of basic commonsense" to have a signed writing before an oral agreement regarding dissolution became enforceable. We are unpersuaded by this argument. At the time of the agreement, Jackson was the longtime president of a successful company and represented by two attorneys. Jackson has presented no evidence that she or either of her attorneys ever

suggested this "commonsense" requirement. Notwithstanding this lack of evidence, Jackson would now have this court assume such a crucial fact based solely on her opinion. This appeal to "commonsense" is simply an attempt to have this court substitute our judgment for that of the trial court, which we will not do here. *Best*, 223 Ill. 2d at 350.

¶ 34    "Illinois encourages the settlement of claims, and, to that end, settlement agreements may be oral." *Kim v. Alvey, Inc.,* 322 Ill. App. 3d 657, 669 (2001). A properly proved oral agreement is enforceable without a subsequently signed agreement. *Lampe*, 292 Ill. App. 3d at 147-48. To hold otherwise simply because a party believes that a signed agreement is a commonsense expectation "would dilute the binding effect of oral compromises and settlement agreements and permit parties thereto to change their minds at their pleasure." *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 43 (quoting *In re Marriage of Lorton*, 203 Ill. App. 3d 823, 826 (1990)). Morris and Lazzara both testified that an oral settlement agreement had been reached without a condition precedent or a reduction to writing. The trial court had the opportunity to observe Morris and Lazzara and found their testimony on this issue credible. Consequently, the trial court found that the parties reached a valid oral settlement agreement. This finding was not against the manifest weight of the evidence.

¶ 35    Jackson next argues that because she and Lazzara did not speak to each other at the meeting, there was no meeting of the minds to form a binding oral agreement. "Oral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *K4 Enterprises, Inc.* 394 Ill. App. 3d at 313. "A meeting of the minds exists whenever the parties' conduct objectively indicates an agreement to the terms of the settlement, even if one or more parties did not subjectively intend to be bound." *County*

*Line Nurseries and Landscaping, Inc., ex rel. Bankruptcy Trustee v. Glencoe Park Dist.*, 2015 IL App (1st) 143776, ¶ 33. The parties' objective conduct rather than their subjective beliefs determines the existence of a meeting of the minds because a test based on subjective beliefs would enable a party to evade its contractual commitments. *Paxton–Buckley–Loda Education Ass'n, IEA–NEA v. Illinois Educational Labor Relations Board*, 304 Ill. App. 3d 343, 350 (1999).

¶ 36    In this case, Jackson's objective conduct at the settlement conference reflected a meeting of the minds, even though she did not speak directly to Lazzara. Morris testified that Jackson was at times actively involved in the meeting. He stated that Jackson proposed the date of February 15th "for termination of the business" and selected January 22 as the date for notices to go out to clients. He also testified that Jackson participated and spoke on other issues. At other times, Jackson was silent, but deferred to her counsel who spoke on her behalf. Lazzara testified that Jackson would "typically nod her head" when her attorneys made comments such as "Yes, that is what we'll do." In other instances, she did not object when her attorneys made "affirmative statements agreeing" to settlement terms.

¶ 37    Relying on *Brewer v. National R.R. Passenger Corp.*, 165 Ill. 2d 100 (1995), Jackson argues that there is no evidence that her attorneys ever had express authority to settle the 2007 case. In *Brewer*, the plaintiff sought damages for injuries suffered in the course of his employment with defendant. 165 Ill. 2d at 102. The trial court held a pretrial settlement conference where the trial judge, the attorneys for both the plaintiff and defendant, and defendant's claims agent were present. *Id*. Despite reaching an agreement, the parties disagreed on the plaintiff's duties in the settlement. *Id*. at 103. The defendant alleged that the plaintiff's

14

attorney agreed that the plaintiff would quit his job with the defendant. *Id*. The trial court dismissed the lawsuit with prejudice, but the dismissal order did not incorporate an agreement that the plaintiff would quit his job. *Id*. The defendant moved to enforce its version of the settlement agreement, which the court granted. *Id*. at 104. The trial judge assumed that plaintiff's attorney conferred with the plaintiff regarding the resignation issue. *Id*. This court affirmed. However, our supreme court reversed, noting that, "[t]he authority of an attorney to represent a client in litigation is separate from and does not involve the authority to compromise or settle the lawsuit." *Id*. at 106. The *Brewer* court held that "where a settlement is made out of court and is not made a part of the judgment, the client will not be bound by the agreement without proof of express authority." *Id*. at 105.

¶ 38    *Brewer* is distinguishable. In *Brewer*, there was no evidence that the plaintiff's attorney ever discussed the resignation issue with the plaintiff, and it was therefore improper for the court to presume that such a discussion took place. *Id*. at 106. Here, no presumption of Jackson's knowledge is necessary. Unlike the plaintiff in *Brewer*, Jackson was present when the settlement was reached. Although she asserts that there is no evidence that she verbally expressed authority to settle during the conference, the nature and extent of an agency relationship may be shown by circumstantial evidence. *Sakun v. Taffer*, 268 Ill. App. 3d 343, 351 (1994). Specifically, the scope of an agent's authority may be determined by what a reasonable person might rightfully believe the agent to have based on the principal's conduct. *Id*.

¶ 39    Under these circumstances, a reasonable person would believe that Jackson's attorneys had authority to settle the case. Jackson was present when her attorneys agreed to settle and did not

15

act. "Where a party stands by silently and lets his attorney act in his behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority to a third person." *Condon and Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923, ¶63 (quoting *Kulchawik v. Durabla Mfg. Co.*, 371 Ill. App. 3d 964, 971 (2006)). Jackson was represented by two attorneys, the settlement conference was held in the office of one of those attorneys, and her attorneys asked Morris to serve as scrivener and draft a settlement agreement. The evidence clearly demonstrates that her attorneys had apparent authority to act on her behalf.

¶ 40        Even if Jackson's attorneys did not have express authority to settle, Jackson ratified their actions. Ratification of an unauthorized act is tantamount to authorization and confirms what was originally unauthorized. A client ratifies the actions of the client's attorneys by not repudiating the actions once there is knowledge. *Condon*, 2016 IL App (1st) 151923, ¶65 (quoting *Kulchawik*, 371 Ill. App. 3d at 970). Here, Jackson was present when her attorneys agreed to the settlement, and therefore, had knowledge of their actions. She does not dispute that she nodded her head or stood by silently while they spoke on her behalf. If settling the case exceeded her attorneys' scope, Jackson's failure to repudiate her attorneys' actions ratified them. She cannot now escape the consequences of those actions or her ratifications.

¶ 41        Jackson also argues that equitable distribution was her primary goal and, as such, she would not have agreed to waive that right. We are unpersuaded by this argument. Paragraph 7 of the draft settlement agreement states:

    Each of Jackson and Lazzara may commence operating their respective
    business enterprises immediately after P&A ceases doing business. No covenant

16

not to compete restrains Jackson or Lazzara, and each is free, individually or with others, to pursue any line of business in which P&A is currently engaged, immediately after the close of business on February 15, 2008.

¶ 42    Paragraph 26 states:

Upon performance by each of Jackson and Lazzara of the terms and conditions of this Agreement, then the parties will exchange full releases of all claims between and among themselves and P&A, and will stipulate to the dismissal, with prejudice, of the litigation.

¶ 43    Jackson does not argue that either paragraph is unconscionable or unenforceable. See *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99-100 (2006). Instead, she acknowledges that she and Lazzara had to compete for P & A Billing's clients because they could not force any customer to go with their new company and because the accounts could not be divided any other way. This acknowledgment supports the inclusion of paragraph 7 as any agreement between Jackson and Lazzara would contain some version of its language. Jackson, however, maintains that once the clients chose a new company following P & A Billing's dissolution, Jackson and Lazzara could then determine the remaining portion of the book of business and offset the difference by way of cash payment to the shareholder who ended up with less than 50% of the total book of business. Jackson's proposed solution is a much more complicated solution than the one presented in the draft settlement agreement, and there is no evidence that Jackson or her attorneys ever intended or requested this outcome.

¶ 44    In the crucial January 25, 2008 email exchange, Deer never mentions this proposed solution, nor does he dispute the inclusion of paragraph 7 or 26. Given that equitable

distribution of P & A Billing's assets was Jackson's primary goal, it would be reasonable to expect Jackson, or her attorneys to reject these terms or at least propose a modification. Neither happened. On January 21, 2008, Deer received the draft agreement with these terms. Four days later, on January 25, Morris emailed Deer looking for an update. Deer offered none concerning these terms. Jackson received the draft agreement on January 22 and presented no evidence that she ever opposed these terms. Instead, the evidence shows that Jackson was more concerned with the February 15 closing date.

¶ 45    The trial court found that Jackson and Lazzara reached an oral agreement on January 18, 2008, and that the draft agreement prepared by Morris accurately memorialized the terms of the oral agreement. As previously stated, the existence of an oral agreement and its terms are questions of fact, and the trial court's determinations on those questions will not be disturbed unless they are against the manifest weight of the evidence. *Kohler*, 397 Ill. App. 3d at 785. The trial court found that paragraphs 7 and 26 were part of the oral agreement, and there is no evidence that Jackson ever rejected those terms. We find the trial court's determination that the parties agreed not to distribute the value of P & A Billing according to their respective equitable interests, but instead, to have Jackson and Lazzara compete for P & A Billing's clients, was not against the manifest weight of the evidence.

¶ 46                                 CONCLUSION

¶ 47    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 48    Affirmed.

18